Carroll
No. 2010-816

THE STATE OF NEW HAMPSHIRE

v.

TIMOTHY PERRI

Argued: September 12, 2012
Opinion Issued: December 7, 2012
Opinion Modified: January 10, 2013

*Michael A. Delaney*, attorney general (*Susan P. McGinnis*, senior assistant attorney general, on the brief and orally), for the State.

*Lisa L. Wolford*, assistant appellate defender, of Concord, on the brief, and *Christopher M. Johnson*, chief appellate defender, of Concord, orally, for the defendant.

HICKS, J. The defendant, Timothy Perri, appeals his convictions for kidnapping, *see* RSA 633:1, I(d) (2007), aggravated felonious sexual assault, *see* RSA 632-A:2, I(a) (2007), attempted aggravated felonious sexual assault, *see* RSA 629:1 (2007); RSA 632-A:2, I(a), and criminal threatening, *see* RSA 631:4, I(a), II(a)(2) (2007). He argues that the Superior Court (*Houran*, J.) erred in: (1) denying his motion to suppress eyewitness identification evidence; (2) limiting his ability to cross-examine the victim; and (3) allowing the admission of evidence of a pocket knife discovered on his person when apprehended by the police. We affirm.

I

The following facts are drawn from the trial court's order denying the defendant's motion to suppress. N.R., the victim, told police that she had been walking home from work late on the evening of August 22, 2008, along Route 16 in North Conway when a man approached her and proposed to pay her for a sexual act. She said the man told her he was from out of town and worked as a painter in the area. She rebuffed him and walked alone for about a mile, but the man approached her again near a scenic overlook and once more made a sexual advance. After she rejected him, he punched her in the face, pulled her into the woods, and raped her. She described her attacker as a white man in his late twenties or early thirties, with a thin, muscular build, a narrow face, and a goatee.

After receiving another report on September 18 of a sexual assault occurring in the same area, the police issued a "be on the lookout" alert for the man N.R. had described. The defendant was apprehended several days later when State Trooper Craig McGinley saw him walking near the scenic overlook and, after speaking with him, identified several characteristics that matched the description given by N.R. The police assembled a

photographic array displaying the defendant and seven other men selected from the police department's computer system and, on September 25, presented it to N.R. at her home. N.R. identified the defendant as the attacker.

On September 26, N.R. met at the police station with Elizabeth Kelley, the program director of the Child Advocacy Center. During that interview, N.R. expressed uncertainty as to her identification of the defendant. For example, in response to Kelley's question as to "how sure [she was] that it was the guy," N.R. responded, "I don't, I don't know." According to a police lieutenant, the police suspended their investigation as a result of N.R.'s uncertainty.

Trooper McGinley, however, continued investigating the incident and assembled a file on the defendant, including photographs of him and documents regarding his criminal background. On June 19, 2009, McGinley visited N.R. at work and told her he believed that she had chosen the right person in the photo array, and later testified he did so to reassure her that the police cared about her case. He then gave N.R. the file and stepped away for approximately five minutes while she looked at it. When he returned, he gave N.R. his contact information and told her to contact him if she wanted to pursue the matter further.

On June 28, N.R. sent McGinley a text message stating she would like to "help put this guy away." On July 22, N.R. met with Officer Jody Eichorn of the Moultonborough Police Department for another interview. Officer Eichorn asked N.R. if she had identified her attacker in the photo array on September 25, 2008, to which N.R. responded, "Yes." N.R. then explained that the police had caused her to "second-guess[]" herself after selecting the defendant's photograph when first presented with the photo array, stating that "they kept harping at me" and repeatedly asked how sure she was. N.R. did not remember discussing the photo array at the September 26, 2008 meeting with Elizabeth Kelley. Eichorn then said, "so, at this point today you answered that yes, you're positive that that was him." N.R. answered, "I'm, yeah." The defendant was arrested on July 24.

The State charged the defendant with aggravated felonious sexual assault and kidnapping and a trial was held in April 2010. That trial ended in a mistrial after a jury could not reach a verdict. Subsequently, the State added charges of attempted aggravated felonious sexual assault and criminal threatening. After a retrial, a jury found him guilty of all four charges.

## II

The defendant first argues that the trial court erred in denying his motion to suppress N.R.'s identification of him as her assailant. He asked

the trial court to suppress any testimony about N.R.'s September 25, 2008 identification of the defendant in the photo array, any testimony about the July 22, 2009 conversation with Officer Eichorn in which N.R. confirmed she had correctly identified her assailant, and any in-court testimony positively identifying the defendant as her assailant. He contends that the identification procedures employed by the police were unnecessarily suggestive, in violation of his rights under Part I, Article 15 of the State Constitution and the Fifth and Fourteenth Amendments of its federal counterpart.

We first address the defendant's argument under the State Constitution, *State v. Ball*, 124 N.H. 226, 231-32 (1983), and rely on federal law only to aid in our analysis, *id.* at 233.

■ On appeal from a motion to suppress identification evidence, we will not overturn the trial court's ruling unless, after reviewing the record, we conclude that it is contrary to the weight of the evidence. *State v. Bell-Rogers*, 159 N.H. 178, 181 (2009); *State v. Fecteau*, 133 N.H. 860, 867 (1991). In making this determination, we ask whether the identification procedures used were so unnecessarily suggestive and conducive to irreparable mistaken identification that the defendant was denied due process of law. *Fecteau*, 133 N.H. at 867. The defendant has the initial burden of proving that the identification procedure was unnecessarily suggestive. *State v. King*, 156 N.H. 371, 374 (2007). Only if the defendant has met his burden must we then consider the factors enumerated in *Neil v. Biggers*, 409 U.S. 188 (1972), to determine whether the identification procedure was so suggestive as to render the identification unreliable and, hence, inadmissible. *King*, 156 N.H. at 374. At this stage of the inquiry, the State bears the burden. *Id.*

■ Under *Biggers*,

> the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Biggers*, 409 U.S. at 199-200.

## A

The September 25 photo array contained eight pictures generated through a computer system using N.R.'s description of her attacker and the

appearance of the defendant. Lieutenant Joseph Faia and Sergeant Alan Broyer took the photo array to N.R.'s home and told her they had a person of interest in the case and asked her to look at some photographs. Faia told her to pick the person who attacked her if his picture was in the array, but "[i]f that person isn't in the lineup, do not select anyone." After placing the photographs on the table, N.R. identified the photograph of the defendant as her attacker without hesitation and initialed and dated the space below his image. Faia asked her how sure she was that the man she selected was her attacker and she rated her level of certainty a seven out of ten. The officers did not tell her she had selected the person of interest.

The defendant argues that the photo array procedures were unnecessarily suggestive because the officers "failed materially to follow New Hampshire [Attorney General] protocols specifically designed to eliminate possible suggestiveness in a photo array." We disagree. That the police did not follow every recommendation of the attorney general guidelines does not, in and of itself, satisfy the defendant's burden to show that the manner of presenting the photographs was unnecessarily suggestive. As the trial court recognized, the pertinent inquiry is "whether the police indicated the suspect's identity to the witness by means of the photographic display or by saying something before or contemporaneously with the witness' positive identification," notwithstanding that the police "did not provide [N.R.] with most of the [Attorney General] Guidelines' explanations." *See Bell-Rogers*, 159 N.H. at 181 ("To determine whether the out-of-court identification procedure was unnecessarily suggestive we ask whether the police have implicitly conveyed their opinion of the criminal's identity to the witness by means of the photographic display." (quotation omitted)).

Our review of the record, including the photo array itself, indicates no suggestiveness in the photo array. *Cf. Fecteau*, 133 N.H. at 867. Although the police told N.R. they had a person of interest, there is no evidence that they told her that the defendant's photograph depicted that person. As the trial court found, there was no indication that the officers rushed N.R. to make a decision or implied she should select a particular photograph. Nor did the photo array display the images in a manner that highlighted the defendant's photograph, such as an absence of other images of men with goatees or characteristics similar to the defendant's. The defendant has provided nothing that would satisfy his burden to show that "the police have implicitly conveyed their opinion of the criminal's identity to the witness." *Bell-Rogers*, 159 N.H. at 181 (quotation omitted). Accordingly, we cannot conclude that the trial court's decision as to the admissibility of the photo array was contrary to the weight of the evidence.

Because the Federal Constitution is no more protective of the defendant's rights than the State Constitution under these circumstances, *see, e.g.*, *United States v. Flenory*, 619 F.2d 301, 304 (3d Cir. 1980), we reach the same conclusion under the Federal Constitution.

B

The defendant next argues that N.R.'s identification of him during her July 2009 meeting with Officer Eichorn and her subsequent in-court identification of him were "irrevocably taint[ed]" as a result of Trooper McGinley's interactions with her in June 2009, and, accordingly, both identifications should have been excluded from trial.

■ As noted, we employ a two-step analysis to determine the admissibility of N.R.'s July 2009 out-of-court identification of the defendant. *King*, 156 N.H. at 374. If that identification is found inadmissible under this test, N.R.'s subsequent in-court identification will also be inadmissible "unless it did not result from the earlier confrontation but was independent thereof." *Id.* (quotation and ellipsis omitted).

The trial court determined, and the State does not argue otherwise on appeal, that McGinley's conduct when he visited N.R. at work and showed her the defendant's file was suggestive. The court noted that McGinley "explicitly conveyed to her his opinion that the defendant was her attacker" and subsequently allowed her to review a file containing photographs of the defendant, a document entitled "State v. Timothy Perri / Sexual Assault," and writings about the defendant that evidenced a propensity to commit violence against women. The court nevertheless did not exclude the later identification because it concluded that the State had satisfied the *Biggers* test by clear and convincing evidence.

■ We agree with the trial court that consideration of the five *Biggers* factors supports a finding that N.R.'s identification of the defendant in July 2009 was sufficiently reliable to warrant admission at trial. She had two opportunities to view the defendant on the day of the assault, including in a well-lit area when he first propositioned her for sex and later when he approached her, punched her, and faced her as he raped her on the ground. That her degree of attention was high is shown by her accurate description of his clothing and facial characteristics, as well as by her observation that he held a folding pocket knife against her neck and had an odor of cigarettes. She accurately described the defendant before the June 2009 meeting with Trooper McGinley as being white, thin, and muscular, having a narrow face and a dark goatee, and being a smoker. While she did not exhibit complete certainty in her choice of the defendant's photograph when presented with the photo array, she did note that the defendant's face

"really stood out .... like right away when I saw it." Under the totality of the circumstances, N.R.'s out-of-court identification of the defendant after meeting with Trooper McGinley bore sufficient indicia of reliability to warrant admission at trial. Accordingly, the trial court's decision was not contrary to the weight of the evidence.

Because N.R.'s July 2009 out-of-court identification of the defendant was admissible under *Biggers*, it follows that her in-court identification was also admissible.

As is true with respect to the photo array, the Federal Constitution is no more protective of the defendant's rights than the State Constitution under these circumstances. *See, e.g., Biggers*, 409 U.S. at 200-01 (identification sufficiently reliable where victim faced attacker twice, provided detailed description of his characteristics, and had "no doubt" defendant was the attacker). Accordingly, we reach the same conclusion under the Federal Constitution.

## III

Next, the defendant argues that the trial court erred in prohibiting him from eliciting testimony from N.R. that would have demonstrated that a person who helped prepare her for the second trial was the jury foreperson in the first trial.

The facts relevant to this claim of error are as follows. After the first jury trial ended in a mistrial, its jury foreperson, A.C., wrote a message to N.R. via Facebook expressing feelings of support, telling her she believed in N.R. and noting that others on the jury believed the defendant was guilty. A.C. also provided details as to how the jurors voted and offered her contact information should N.R. have "any questions." The two women then began a correspondence and eventually met in person to discuss ways in which N.R. might improve her testimony to be more credible to the jury in the subsequent trial. During one meeting that took place in the presence of a victim/witness advocate, A.C. provided N.R. with "tips on how to improve [her] testimony," advising her to make clear she was certain of her identification of the defendant at the September 25, 2008 photo array; to better explain why she told Child Advocacy Center director Elizabeth Kelley "I don't know" in response to a question about her level of certainty; and to be more emotional and feel free to cry.

In a motion argued outside the jury's presence, the defendant sought permission to elicit testimony relating to N.R.'s exchanges with A.C., asserting that this information "goes to [N.R.'s] motivation to make her testimony better, to potentially be more emotional" to convince the jury to believe her. The court partially granted the defendant's request, ruling that it was "fair game" for defense counsel to make any "inquiries concerning

whether someone who observed her testimony . . . later contacted [N.R.] and made suggestions." However, the court prohibited defense counsel from referring to or inquiring about the fact that there was a former trial at which another jury was unable to render a decision. Thus, defense counsel was permitted to ask anything "except those [questions] that are premised upon the existence of a prior trial or prior fact finder as a jury and the findings of that jury." Accordingly, defense counsel was precluded from inquiring about A.C.'s status as a juror at the prior trial. The defendant contends this was reversible error because it "seriously undermined [his] ability to present a defense." The State does not contend that the excluded references were not relevant; rather, it argues that the trial court sustainably exercised its discretion under the circumstances.

■ Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." N.H. R. Ev. 403.

> Evidence is unfairly prejudicial if its primary purpose or effect is to appeal to a jury's sympathies, arouse its sense of horror, provoke its instinct to punish, or trigger other mainsprings of human action that may cause a jury to base its decision on something other than the established propositions in the case.

*State v. Cassavaugh*, 161 N.H. 90, 98 (2010) (quotation omitted). We accord the trial court considerable deference in determining whether to admit or exclude evidence under Rule 403, and we will not disturb its decision absent an unsustainable exercise of discretion. *State v. Miller*, 155 N.H. 246, 252 (2007). To show an unsustainable exercise of discretion, the defendant must demonstrate that the court's ruling was clearly untenable or unreasonable to the prejudice of his case. *State v. Stowe*, 162 N.H. 464, 470 (2011).

We disagree with the defendant that the trial court's decision precluding direct references to the former trial or the identity of A.C. as the foreperson of the jury of that trial constituted an unsustainable exercise of discretion. At the outset, we note that defense counsel was permitted to, and did, engage in a thorough cross-examination of N.R. with respect to her exchanges with A.C. Defense counsel elicited several pertinent facts bearing on N.R.'s credibility: that she testified four months earlier under oath with a judge presiding; that the same prosecutor, defense attorney, and defendant were present during her prior testimony; that N.R. faced the same questions during her prior testimony as she did at trial; and that A.C. observed her testimony at the former "hearing" and contacted her thirty days later. Counsel also elicited many details about N.R.'s exchanges with A.C., including that A.C. provided "tips on how to improve [her]

testimony," such as being more emotional, giving more details, clarifying her testimony about the September 26, 2008 interview with Elizabeth Kelley, and crying during the testimony. All of these facts were pertinent to N.R.'s credibility because they tended to suggest her in-court testimony was influenced not by the truth or by genuine emotions, but by "coaching" provided by a person who had observed her previous testimony first-hand and, therefore, had an informed opinion about why that testimony fell short. Because the court permitted defense counsel to explore these topics freely, we need only determine whether the court erred in prohibiting any reference to the fact that A.C. was a juror at a prior trial — not merely an observer at a hearing — that ended in a deadlocked jury.

█ Knowledge of A.C.'s status as a juror at a prior trial could have helped the jury assess the credibility of N.R.'s testimony in the subsequent trial because A.C. was in a unique position, as a juror, to understand the deficiencies in N.R.'s testimony at the prior trial and make recommendations to enhance her testimony. A rational jury could have believed that N.R. would give A.C.'s advice special consideration that she would not otherwise have afforded a mere observer of the prior testimony. But permitting reference to the prior "trial," rather than a prior "hearing," would have risked misleading and confusing the jury because it may have led jurors to speculate as to the prior trial's outcome and the deliberations of the prior jury — both impermissible considerations. *See, e.g., Kinney v. People*, 187 P.3d 548, 558 (Colo. 2008) (*en banc*) (finding reversible error where trial court failed to instruct jury that defendant had been acquitted of charges in other trials, even though trials referred to as "proceedings," when it was evident from the record that jury had speculated that there had been previous trials). In light of these considerations, the trial court acted well within its discretion in concluding that these risks substantially outweighed whatever marginal probative value A.C.'s status as a juror and the outcome of the former trial would have provided. *Cf. United States v. Cook*, 776 F. Supp. 755, 760 (S.D.N.Y. 1991) (permitting counsel to refer to witness's testimony at "a prior trial" but not "the prior trial of this case" (quotations omitted)).

*United States v. Giovanelli*, 945 F.2d 479 (2d Cir. 1991), does not require a contrary result. Although in that case the court held that the defendants should have been permitted to refer to prior "trials" rather than "proceedings" when cross-examining witnesses who had testified at the prior trials, *id.* at 488, it did so for reasons that do not apply to this case. For example, in contrast to the court's concern in *Giovanelli* that "it was at times impossible to focus a witness' attention on a specific prior inconsistent statement," *Giovanelli*, 945 F.2d at 488, here defense counsel directed

N.R.'s memory to the precise time and context of her prior testimony. The defendant does not suggest that the prohibition on reference to a prior "trial" inhibited N.R.'s ability to remember her statements at that trial. Also in contrast to *Giovanelli*, in which the defense could not establish that the prior statements of the witnesses had been made "in a setting as solemn and dignified as the current trial," *Giovanelli*, 945 F.2d at 488, here defense counsel established that the prior hearing bore the same indicia of solemnity and dignity as the trial. Of course, trial courts have an obligation to examine the facts of each case to determine whether limiting a defendant's proposed line of questioning would unduly inhibit the opportunity to confront witnesses for potential bias or other credibility issues — as the court found to be a concern in *Giovanelli*. There may be circumstances in which prohibiting reference to a prior trial constitutes an unsustainable exercise of discretion for reasons similar to those present in *Giovanelli* or other compelling reasons. Here, however, the trial court struck a sustainable balance.

To the extent that the defendant premises his argument upon a claim that the trial court could have cured any dangers of allowing reference to A.C.'s status as a juror or to the prior "trial" through timely jury instructions, that claim is not preserved for our review. *Cf. State v. Hynes*, 159 N.H. 187, 205 (2009) ("As a general rule, we will not consider grounds of objections not specified or called to the court's attention at the trial. This requirement, grounded in common sense and judicial economy, affords the trial court an opportunity to correct an error it may have made and is particularly appropriate where an alleged error involves a jury instruction." (quotation omitted)). Specifically, during the arguments on this issue, the defendant did not propose such instructions to the trial court as a viable alternative to excluding all references to the prior trial.

IV

Next, the defendant argues that the trial court erred in denying his motion to suppress evidence that he possessed a folding pocket knife when he was detained. The State presented the detaining officer's testimony describing the pocket knife as evidence tending to corroborate N.R.'s statement that her attacker held a folding pocket knife against her throat and threatened to kill her during the assault. The defendant contends that the police lacked "reasonable belief that [he was] armed and presently dangerous to the officer or to others," *State v. Coons*, 137 N.H. 365, 367 (1993) (quotation omitted), as is required to justify the frisk search that led to the knife's discovery. The State defends the search on two grounds, contending first that the officers had reasonable suspicion to believe the

defendant was armed and dangerous, and second that, even if the frisk was unlawful, the inevitable discovery doctrine applied to preclude its exclusion at trial.

We first address the defendant's argument under the State Constitution, *Ball*, 124 N.H. at 231-32, and rely on federal law only to aid in our analysis, *id.* at 233. In reviewing the trial court's ruling, we accept its factual findings unless they lack support in the record or are clearly erroneous. *State v. McKinnon-Andrews*, 151 N.H. 19, 22 (2004). "The application of the appropriate legal standard to those facts, however, is a question of law, which we review *de novo*." *State v. Roach*, 141 N.H. 64, 66 (1996).

■ Once an officer is justified in making an investigatory stop, he may also conduct a protective frisk if he reasonably believes the individual is armed and presently dangerous. *State v. Michelson*, 160 N.H. 270, 272 (2010). The purpose of a protective frisk is not to discover evidence of a crime, but to allow the officer to pursue his investigation without fear of violence. *Id.* Therefore, the frisk must be strictly confined to what is minimally necessary to discover the presence of a weapon. *Id.*

■ Here, the police were justified in conducting a protective frisk of the defendant. On September 19, Trooper McGinley received the "be on the lookout" alert describing "multiple forcible rape[s]" in the area. The report indicated that the Conway police were looking for a "white male, in his 30's, 5'7" to 5'8" tall, slim build and unshaven face with goatee[, and] . . . smoker's breath," who may be a painter and had been seen wearing a maroon hooded sweatshirt. McGinley later learned that N.R.'s assault took place near the scenic overlook in North Conway. He testified that, at around 8:40 p.m. on September 21, he saw the defendant walking near the overlook and believed he matched the description of the rape suspect. McGinley pulled behind the defendant in his police cruiser and stopped him for questioning, during which he observed that the defendant was wearing a hooded sweatshirt and dark jeans with paint on them, was smoking a cigarette, and had a goatee. In McGinley's estimation, the defendant matched the person described in the report "to a tee." After backup police officers arrived on the scene, one of them, according to his testimony, patted the defendant down and found the folding pocket knife. Given that the defendant's appearance closely corresponded to the person described in the report of a violent rape occurring in the same area, there was reasonable suspicion to believe the defendant would be armed and dangerous when faced with imminent apprehension by the authorities. *Cf. United States v. Bullock*, 510 F.3d 342, 347 (D.C. Cir. 2007) ("[C]ourts routinely hold that protective frisks to ensure officer safety are permissible when an officer has reasonable suspicion that the suspect committed a crime involving or associated with

carrying or using a weapon.") (citing cases); *United States v. Barnett*, 505 F.3d 637, 640 (7th Cir. 2007) (reasonable suspicion to frisk where person was suspected of burglary, a crime "normally and reasonably expected to involve a weapon"); *Terry v. Ohio*, 392 U.S. 1, 33 (1968) (Harlan, J., concurring) ("the right to frisk must be immediate and automatic if the reason for the stop is, as here, an articulable suspicion of a crime of violence").

Because the Federal Constitution is no more protective of the defendant's rights than the State Constitution under these circumstances, *see Barnett*, 505 F.3d at 640; *Michelson*, 160 N.H. at 273, we reach the same conclusion under the Federal Constitution.

## V

Finally, the defendant argues that the trial court erred by admitting the pocket knife evidence because it was irrelevant. All evidence must be relevant to be admissible. N.H. R. Ev. 402. Relevant evidence is that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.H. R. Ev. 401. Whether evidence is relevant is a question for the trial court's sound discretion, and we will not overturn its determination absent an unsustainable exercise of discretion. *State v. Town*, 163 N.H. 790, 795 (2012). To show an unsustainable exercise of discretion, the defendant must demonstrate that the court's ruling was clearly untenable or unreasonable to the prejudice of his case. *Id.*

The defendant contends that the evidence had no probative value because the State did not establish that the knife found on him when he was detained was the same as, or even similar to, the knife used in the August 22, 2008 assault. However, contrary to the defendant's assertion that there was "no way to establish that the knife found on" him "was similar to" the knife described by N.R., both Officer Walker and N.R. described their observations in consistent terms: Walker testified that the knife on the defendant "was just a folding pocketknife," while N.R. testified that she saw the defendant pull a pocket knife from his pocket, heard the sound of a knife clicking open, and felt the blade on her throat. Moreover, the State need not marshal conclusive evidence to connect the knife found on the defendant's person to the crime scene for the knife to be admissible in evidence. *See People v. Farnam*, 47 P.3d 988, 1025 (Cal. 2002). That many persons possess similar knives "may diminish the strength of the evidence, but it does not make it irrelevant." *Id.* (quotation omitted). The fact that the defendant carried a pocket knife on his person, near the scene of the crime, tended to make it more probable than without such evidence that he committed the assault. *Cf. State v. Giddens*, 155 N.H. 175, 180 (2007)

(statements made by defendant about methods for committing rape were relevant because methods were similar to the events of the alleged rape). Therefore, the trial court acted within its discretion in admitting the evidence.

*Affirmed.*

DALIANIS, C.J., and CONBOY, LYNN and BASSETT, JJ., concurred.