Coos
No. 2013-217

THE STATE OF NEW HAMPSHIRE

v.

ROBERT TOWLE

Argued: September 11, 2014
Opinion Issued: January 29, 2015

*Joseph A. Foster*, attorney general (*Elizabeth C. Woodcock*, assistant attorney general, on the brief and orally), for the State.

*Christopher M. Johnson*, chief appellate defender, of Concord, on the brief and orally, for the defendant.

HICKS, J. After a jury trial in Superior Court (*Bornstein*, J.), the defendant, Robert Towle, was convicted on four counts of aggravated felonious sexual assault for engaging in fellatio and anal penetration with his minor son, and on four counts of criminal liability for the conduct of another for encouraging his wife and another adult to engage in sexual acts with his minor son. *See State v. Towle*, 162 N.H. 799, 800 (2011); *see also* RSA 632-A:2 (2007) (amended 2008, 2012, & 2014); RSA 632-A:3 (Supp. 2003) (amended 2006, 2008, 2010, & 2014); RSA 626:8 (2007). The trial court sentenced the defendant to serve 57 to 114 years in prison and ordered the defendant to have no contact with the victim, the reporting witness, and his other minor son. On appeal, the defendant raises two challenges to his convictions and one challenge to his sentence. The defendant argues that the trial court erred by: (1) permitting the State to use prior statements to refresh the victim's recollection when the victim had not demonstrated an inability to recall the relevant event; and (2) permitting the State to introduce testimony referring to inadmissible photographic evidence. In addition, the defendant argues that the trial court erred by imposing the no-contact order. We affirm the convictions and reverse the no-contact order.

The defendant first argues that the trial court erred by permitting the State to use prior statements to refresh the victim's recollection of the final

sexual assault that occurred in early 2006, after the victim had been removed from the defendant's custody. The defendant asserts that the victim testified unequivocally that the defendant had not sexually assaulted him on that occasion and was neither confused nor uncertain. Therefore, he argues, the State had no justification for refreshing his recollection.

The record reflects the following exchange on direct examination:

> [State]: And did anything happen at that time when your father [was] there?
>
> [Victim]: Well, I had showed up. And he was in the computer room with the baby. I went back there. And we were chit-chatting. He was doing whatever on the computer and drinking a beer. And then he had asked me to take my pants off. And I was like, really? You know, we're already in this situation and you're right here asking me to take my pants off. And I just had a serious problem with that.
>
> [State]: And then what ended up happening?
>
> [Victim]: To the best of my knowledge, I just decided against it. I was really uncomfortable with the whole situation. I didn't want it to happen, period. You know? It was I'm here to see my brother, not to engage with you. You know? It's unnecessary.
>
> . . . .
>
> [State]: [D]id you argue with him or what?
>
> [Victim]: No, I don't believe there was any real arguing. Just, you know, I felt my time being there was over and I believe I left.
>
> . . . .
>
> [State]: And so did anything happen between you and your father at that location?
>
> [Victim]: No, because I believe I made sure it didn't.

The defendant, who represented himself at trial, revisited the incident during his cross-examination of the victim:

> [Defendant]: [The State] asked you — he was trying to ask you, you know, if you were assaulted by me at the Reed's [*sic*] house on High Street.
>
> [Victim]: Right.
>
> [Defendant]: And just in your testimony, you conveyed to him that nothing happened?
>
> [Victim]: To the best of my memory, nothing happened. I put it — you know, I said no.

[Defendant]: Just a second ago, did you not just say to me that it wasn't in front of [infant son], it was —

[Victim]: Well, the situation that you were trying to do wasn't happening in front of [infant son].

[Defendant]: My question to you was not whether there was a situation. My question was —

[Victim]: Well, if you're referring to nothing happening, you know, you trying to get me to take my pants off, and if that's not it, then please fix me — point me to where I'm supposed to go with that. Correct me. That's what I'm trying to say.

On redirect, the State attempted to use the victim's prior statements to refresh his recollection of the incident. The defendant objected on the basis that the State had not laid a foundation for refreshing the victim's recollection. The trial court sustained the objection and ordered the State to first establish that the victim's recollection needed refreshing. The following exchange occurred:

[State]: Now, in terms of your testimony yesterday during direct and cross-examination, you talked about visiting your brother . . . .

[Victim]: Uh-huh.

. . . .

[State]: And you recall the Defendant propositioning you at that time to do what had happened many times before that you testified?

[Victim]: Yes, sir.

[State]: And at that point you testified that you didn't recall him actually performing oral sex on you at that time; is that correct?

[Victim]: I did.

Next, the State asked the victim to review a portion of his interview with a staff member at the Child Advocacy Center and whether the interview refreshed his recollection about the incident that had occurred in early 2006. The victim stated that the interview did refresh his recollection, and the defendant objected.

During the ensuing sidebar conference, the defendant argued that the State was attempting to refresh the victim's recollection when the victim, on direct examination, had never stated that he could not remember what had occurred and stated clearly that nothing had happened. The State argued that the victim had just declared that he did not recall what had occurred, and only at that point did the State ask the victim to review the interview transcript. The trial court overruled the objection and allowed the

State's examination to continue. The State continued its redirect examination and the victim stated that he remembered the defendant asking him to take his pants off and the defendant actually performing oral sex on him.

The defendant reiterated his objection during the next day of trial and in a motion to dismiss after the conclusion of the State's case. The State argued that the victim had stated on redirect examination that he did not remember if anything had occurred during that visit with the defendant in early 2006 and that its efforts to refresh the victim's recollection were proper. After noting that it had "observed and heard the entire course of trial and . . . the circumstances presented," the trial court ruled that refreshing the victim's memory was proper.

The trial court has broad discretion to determine the admissibility of evidence, and we will not upset its ruling absent an unsustainable exercise of discretion. *State v. Miller*, 155 N.H. 246, 249 (2007). For the defendant to prevail under this standard, he must demonstrate that the trial court's decision was clearly untenable or unreasonable to the prejudice of his case. *Id.*

█ It is well-settled that counsel can use a prior written statement to stimulate the recollection of a witness who demonstrates a doubtful memory while testifying. *See State v. Cote*, 143 N.H. 368, 372 (1999); *see also* N.H. R. Ev. 612; *State v. Slocinski*, 89 N.H. 262, 265 (1938). For an effort to refresh recollection to be proper, it is widely recognized that there must be a "lack of effective present recollection without stimulation by the memorandum." Maguire & Quick, *Testimony: Memory and Memoranda*, 3 How. L.J. 1, 21 (1957); 3 J. WIGMORE, EVIDENCE § 758, at 125 (Chadbourn rev. 1970). The defendant argues that absent a sufficient basis to conclude that the victim's memory had failed, any effort to refresh his recollection was improper and prejudicial.

█ A witness's clear statement indicating that the witness's memory has failed provides the most direct method for a trial court to determine that a witness lacks effective present recollection. *Cf. Bartis v. Warrington*, 91 N.H. 415, 416 (1941) (concluding that where a witness has testified positively and not indicated a failing memory that no basis exists for refreshing recollection). Nevertheless, that is not the only way to determine that a witness lacks effective present recollection. *See* WIGMORE, EVIDENCE, supra § 765, at 145. We have recognized that a trial court is in the best position to consider the demeanor of a witness and determine whether the witness lacks present recollection, and we have held that a trial court properly exercised its discretion in permitting a party to refresh a witness's recollection without a statement that the witness's memory has failed. *See Cote*, 143 N.H at 372.

The defendant argues that *Cote* is distinguishable from the present matter because in *Cote* the witness was a young child, and the trial court found he was giving one word answers to questions in order to end the examination and avoid discussing traumatic events. *Id.* at 371-72. The defendant contends that *Cote* is inapplicable because the witness was an adult, albeit one who was testifying about serious abuse he had suffered for many years as a child, and because he was able to give "a comprehensive and detailed account of the events on the day in question."

■ These factual distinctions are not dispositive. Our decision in *Cote* is neither limited to its facts nor anomalous. In fact, *Cote* is consistent with other jurisdictions that grant broad discretion to trial courts to determine whether refreshing a witness's recollection is warranted. *See, e.g., Thompson v. United States*, 342 F.2d 137, 140 (5th Cir. 1965) (holding that the trial court's ability to observe the witness's demeanor and responses to questions supported its conclusion that a witness's memory was exhausted); *Montgomery v. Tufford*, 437 P.2d 36, 39 (Colo. 1968) ("[B]ecause of the wide variety of situations to which the procedure [for refreshing recollection] must be adapted, considerable discretion is allowed the trial court."). Thus, a trial court can rely on factors other than direct statements to evaluate whether a witness's memory has been exhausted.

■ Furthermore, we disagree with the defendant's assertion that "[n]othing in [the victim's] trial testimony . . . afforded a basis to allow the prosecutor to employ the refreshing-recollection device." In his testimony, the victim described a myriad of abuses inflicted on him by the defendant. He testified with clear and unambiguous language to such things as statements the defendant made to him, acts the defendant made him perform or performed on him, and where and when such acts occurred. When he began to detail the incident that occurred in early 2006, however, the tone of his language became uncertain and ambiguous. In his description of that incident, he began using phrases such as "I believe," "to the best of my knowledge," or "to the best of my memory" before detailing what he believed had occurred. This phraseology suggests uncertainty or a failure of memory, and the shift from clear and unambiguous language to uncertain language, along with the trial court's ability to observe the victim's demeanor, supports the trial court's reasonable conclusion that the victim's memory was exhausted. Furthermore, the victim, on redirect examination, testified that he "didn't recall [the defendant] actually performing oral sex on [him]" in early 2006. Accordingly, we conclude that the trial court properly exercised its discretion by permitting the State to use the victim's prior statements to refresh his recollection.

The defendant next argues that the trial court erred by permitting the State to elicit testimony referencing evidence that had been excluded prior to trial. The defendant asserts that the repeated references to the excluded evidence unfairly prejudiced his case.

The record reflects the following relevant facts. Before the trial began, the defendant filed a pre-trial motion to exclude five photographs that depicted the defendant and the victim nude and in various states of arousal. The trial court granted the motion to the extent that the photographs and any "explicit inflammatory testimony" describing the photographs would not be admissible at trial unless the defendant "opened the door." Nevertheless, the trial court allowed the State to elicit testimony regarding the photographs and their "inappropriate" nature to explain why E.J., the witness who brought the sexual abuse to the attention of the police and the New Hampshire Division for Children, Youth, and Families (DCYF), came forward with her allegations. Then, prior to E.J.'s testimony, the trial court ruled that the photographs could be described as evidence that E.J. believed would implicate the defendant in criminal activity. In reaching this conclusion, the trial court found that the photographs had significant probative value, particularly with respect to explaining why E.J. went to the police and DCYF and why those agencies took action against the defendant, but the photographs could unfairly prejudice the defendant. Therefore, the trial court excluded the photographs and any graphic descriptions thereof but permitted testimony that E.J. had evidence that she believed substantiated her allegations in order to provide context to her actions and testimony.

During the trial, other witnesses briefly discussed the photographs in various contexts. The victim, during the State's direct examination, testified that he finally "opened up" about the sexual abuse after his guardian ad litem (GAL) confronted him with the fact that she had "[seen] the pictures." This was the only time during trial that this evidence was referred to as being photographic in nature.[1] Attorney Jennifer Dougherty and Karen York, who were both affiliated with DCYF, Detective Karl Nelson of the Berlin Police Department, and Attorney Wendy Roberts, the victim's GAL, were all asked on cross-examination by the State about physical evidence, specifically referring to the photographs, brought by E.J. to substantiate the allegations she made to DCYF and the Berlin police. The trial court overruled the defendant's objections to these lines of questioning because it found that the defendant, during his direct examination of each witness, had

---

[1] We note that this testimony occurred prior to the trial court's decision to prevent E. J. from referring to the photographs as anything but "evidence." After the trial court imposed this limitation, the photographs were referred to as either evidence or evidence that E.J. believed was substantial or credible.

challenged E.J.'s credibility regarding the claims she had made to DCYF and the Berlin police, as well as the bases for both entities to take action against him. The trial court concluded that the defendant had "opened the door" for the State to correct any false or misleading impressions the witnesses' responses may have created and, further, that the probative value of the testimony the State sought to elicit was not substantially outweighed by the danger of unfair prejudice to the defendant.

On appeal, the defendant argues that the trial court erred by permitting the State to reference the excluded photographs, whose unfair prejudice, it previously had ruled, substantially outweighed any probative value. He asserts that the cumulative effect of the references to the photographs "created the same impression that would have been created had more explicit testimony describing the photographs been admitted." He contends that the cumulative effect of these references unfairly prejudiced him in a manner that necessitates reversing his convictions. We disagree.

██ To determine whether alleged cumulative errors require reversal, we first determine whether the trial court did, in fact, err. *See State v. Ellsworth*, 142 N.H. 710, 721 (1998). The defendant challenges the trial court's application of New Hampshire Rule of Evidence 403, which states, in relevant part, that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." N.H. R. Ev. 403. We have recognized that evidence that provides context to a witness's statements or actions may have significant probative value. *See State v. Willis*, 165 N.H. 206, 223 (2013) (describing potentially prejudicial statements during an interview that provided context to defendant's evasive answers as "probative"). Nevertheless, where the probative value of that evidence is substantially outweighed by the danger of unfair prejudice, it must be excluded. N.H. R. Ev. 403.

█ Evidence is unfairly prejudicial if its primary purpose or effect is to appeal to a jury's sympathies, arouse its sense of horror, provoke its instinct to punish, or trigger other mainsprings of human action that may cause a jury to base its decision on something other than the established propositions in the case. *State v. Perri*, 164 N.H. 400, 408 (2012). Unfair prejudice is not mere detriment to a defendant from the tendency of the evidence to prove guilt, in which sense all evidence offered by the prosecution is meant to be prejudicial. *State v. Tabaldi*, 165 N.H. 306, 322 (2013). Rather, the prejudice required to necessitate reversible error is an undue tendency to induce a decision against the defendant on some improper basis, commonly one that is emotionally charged. *Id.* Among the factors we consider in weighing the evidence are: (1) whether the evidence

would have a great emotional impact upon a jury; (2) its potential for appealing to a juror's sense of resentment or outrage; and (3) the extent to which the issue upon which it is offered is established by other evidence, stipulation, or inference. *Id.* at 322-23.

The trial court can, however, obviate the danger of unfair prejudice by such actions as issuing a limiting instruction to the jury or limiting the scope of the evidence that the parties are permitted to present to the jury. *See, e.g., Willis*, 165 N.H. at 224 (holding that a limiting instruction to the jury on how to interpret potentially prejudicial evidence cured any error created by admitting the evidence); *Perri*, 164 N.H. at 408-09 (finding that limiting the scope of the parties' ability to introduce prejudicial details to the jury cured the danger of creating unfair prejudice). The trial court is in the best position to gauge the potential prejudicial impact of particular testimony, and to determine what steps, if any, are necessary to obviate the potential prejudice. *Id.* at 323. Thus, we afford considerable deference to the trial court's determination in balancing prejudicial impact and probative worth. *State v. Beltran*, 153 N.H. 643, 649 (2006) (applying the same evidentiary standard under New Hampshire Rule of Evidence 404(b)). To prevail, the defendant must show that the trial court's ruling was clearly untenable or unreasonable to the prejudice of his case. *Id.*

With respect to each reference to the excluded photographs, we conclude that the trial court's ruling is sustainable. The references to the photographs provided necessary context to testimony of the witnesses. In ruling on the defendant's pre-trial motion, the trial court stated: "[T]he photographs themselves are not admissible. Explicit inflammatory testimony describing the contents of the photos is not admissible; however, the State [may] elicit reasonable evidence describing, again, at least the photographs insofar as they offer an explanation of why [E.J.] went to the police and what she said . . . ." At that time, the trial court permitted the State to refer to the contents of the photographs as "inappropriate," but prior to E.J.'s testimony it revised its ruling and limited E.J.'s ability to characterize the photographs to "evidence of a crime that [the defendant] committed." In making these rulings, the trial court accepted the State's argument that reference to the photographs was necessary to explain why E.J. went to the police and DCYF to report the defendant's activities with the victim and why the police took her allegations seriously. In reaching this conclusion, the trial court recognized that the photographs had substantial probative value, due to the context they provided, but also created a substantial danger of unfair prejudice, due to their graphic nature, and tailored its response accordingly to permit the most probative aspects to be introduced while excluding the most prejudicial aspects.

In response to the defendant's objection after the victim had testified that he disclosed the abuse to his GAL after she told him that she had "[seen] the pictures," the trial court found that the statement provided context to the victim's testimony regarding why he finally came forward with his story. The trial court also found that nothing in that passing statement violated its ruling on the defendant's pre-trial motion concerning how the photographs could be characterized and did not unfairly prejudice the defendant. Thus, the trial court sustainably concluded that the testimony was proper.

In response to the defendant's efforts to attack the testifying witnesses' credibility, E.J.'s credibility, and the actions of the police and DCYF in response to E.J.'s complaint, the trial court found that:

> the Defendant had questioned [his witnesses] . . . about the conclusions at which they had arrived as to whether the Defendant may have sexually assaulted or otherwise sexually abused [the victim], and about the actions that they took based on those concerns and conclusions in the years 2006, 2007 and 2008.

The trial court found that the witnesses' testimony could, without clarification, lead the jury to conclude that the Berlin police and DCYF had no justification for taking action against the defendant. The trial court thus concluded that the probative value of such clarification was not substantially outweighed by the risk of unfair prejudice. Accordingly, the trial court ruled that the defendant had "opened the door" for the State to elicit limited testimony regarding the photographs.

On appeal, the defendant does not argue that the trial court erred by concluding that the testimony elicited from his witnesses on direct examination "opened the door"; instead, he argues that the references to the photographic evidence created an impression that unfairly prejudiced him. We will assume without deciding that New Hampshire Rule of Evidence 403 applies to the testimony in question, regardless of whether the door had been opened.

The trial court excluded, in its ruling on the pre-trial motion, the most prejudicial aspect of the evidence, the photographs themselves and any descriptions of the photographs' contents. These limitations minimized the danger of unfair prejudice while preserving the probative aspect of the evidence — that is, explanation as to why witnesses undertook actions leading to the investigation of the defendant. *See Perri*, 164 N.H. at 408-09. Throughout the trial, the trial court ruled that the testimony regarding the photographs was necessary to provide context to the witnesses' actions. Accordingly, we conclude that the trial court did not unsustainably exercise

its discretion in permitting the defendant's witnesses to explain, on cross-examination, that they had seen or were aware of photographic evidence of criminal conduct by the defendant. Furthermore, the trial court offered to issue a limiting instruction to the jury to cure any potential unfair prejudice that the defendant believed to exist; the defendant declined the offer. Thus, because the trial court did not err in admitting any of the challenged statements, there is no "cumulative error." *See Ellsworth*, 142 N.H. at 721.

We next address the defendant's challenge to the no-contact order imposed on him as a condition of his sentence. The defendant asserts that, pursuant to RSA 651:2 (Supp. 2014), a trial court cannot impose a no-contact order as part of a sentence of imprisonment. He contends that a trial court can impose such a condition only on suspended or probationary sentences or conditional discharges, where violation of the condition may lead to imposition of the sentence or revocation of probation. We agree.

■ We first determine whether this challenge was properly preserved for our review. *See State v. Blackmer*, 149 N.H. 47, 48 (2003). The general rule is that a contemporaneous and specific objection is required to preserve an issue for appellate review. *Id.* Here, during the sentencing hearing, the defendant challenged the no-contact order only with respect to his minor son. To the extent that he challenges the entire no-contact order, the defendant did not preserve that issue for our review. Nevertheless, we will, as the defendant requests, review the imposition of the entire no-contact order under our plain error rule. *See* SUP. CT. R. 16-A.

■ Under the plain error rule, we may consider errors not raised in the trial court. *See id.* However, the rule should be used sparingly, its use limited to those circumstances in which a miscarriage of justice would otherwise result. *State v. Hancock*, 156 N.H. 301, 302-03 (2007). To find error under this rule: (1) there must be error; (2) the error must be plain; (3) the error must affect substantial rights; and (4) the error must seriously affect the fairness, integrity, or public reputation of judicial proceedings. *Id.* at 303.

We first address whether the trial court exceeded its statutory authority. *See State v. Parmenter*, 149 N.H. 40, 45 (2002) (imposing a sentence in excess of that authorized by statute constitutes reversible error). Whether the trial court exceeded its statutory authority is a question of law, which we review *de novo. Id.* In order to determine whether the trial court exceeded its statutory authority, we must engage in statutory interpretation. *See Hancock*, 156 N.H. at 303. In matters of statutory interpretation, we are the final arbiter of the intent of the legislature as expressed in the

words of a statute considered as a whole. *Id.* We construe provisions of the Criminal Code according to the fair import of their terms and to promote justice. *Id.*

██ RSA 651:2 defines the types of sentences that a trial court may impose upon a person convicted of a felony and limits those options to "imprisonment, probation, conditional or unconditional discharge, or a fine." RSA 651:2, I. We have held that within those parameters, the trial court has broad discretion to "assign different sentences, suspend sentence, or grant probation in order to achieve the goals of punishment, deterrence, protection of society and rehabilitation." *State v. Evans*, 127 N.H. 501, 505 (1985). A trial court cannot exceed those parameters because to do so would exceed its statutory authority. *See, e.g., Parmenter*, 149 N.H. at 46-47 (vacating, as exceeding statutory authority, a sentence provision that required the defendant to attend AA or NA meetings in addition to imposition of a fine and driver's license suspension); *State v. Buckingham*, 121 N.H. 339, 342-43 (1981) (vacating a sentence that revoked the defendant's driver's license because RSA 651:2 did not specifically authorize such a sentence).

██ For example, a trial court may choose, without exceeding its statutory authority, to set a term of imprisonment and partially suspend that sentence or exempt the defendant from punishment, so long as the defendant complies with the conditions imposed. *See, e.g., State v. W.J.T. Enterprises*, 136 N.H. 490, 495-96 (1992) (affirming a sentence that combined a term of imprisonment, a suspended sentence, and a conditional exemption from punishment). A trial court may not, however, set a term of imprisonment or fine and then impose additional conditions upon the defendant as part of the term of imprisonment or fine. *See, e.g., Parmenter*, 149 N.H. at 46-47. When this occurs, we review those additional conditions as if they were independent terms and determine whether a trial court has the authority to impose them. *See id.*

Here, the trial court sentenced the defendant to 57 to 114 years in prison. In addition, the trial court ordered that the defendant not contact certain individuals, including the victim, E.J., and the defendant's youngest son. The trial court did not, however, suspend or defer any part of the sentence, or impose a conditional discharge. Because the trial court sentenced the defendant to imprisonment, the no-contact order is an independent term that requires statutory authority for its imposition.

██ The State argues that the provisions of RSA 651:2 do not prevent the trial court from imposing additional conditions on a term of imprisonment, relying upon on our decision in *State v. Smith*, 163 N.H. 13 (2011). In *Smith*,

however, we were not asked to consider whether the trial court had exceeded its statutory authority by imposing the sentence in question. *Smith*, 163 N.H. at 16. Accordingly, we do not consider *Smith* as having decided the question before us here.[2] Instead, we look to the plain language of RSA 651:2, which does not give trial courts the authority to impose no-contact orders as part of a sentence. RSA 651:2; *cf. Parmenter*, 149 N.H. at 46-47. Thus, by imposing the no-contact order in addition to the term of imprisonment, the trial court exceeded its statutory authority. *See Parmenter*, 149 N.H. at 46-47.

With respect to the remaining plain error factors, we conclude that they have been satisfied. Because we have previously defined the scope of RSA 651:2, *see, e.g., Buckingham*, 121 N.H. at 343, and the authority of trial courts to impose conditions on sentences that are suspended or subject to conditional discharge or probation, *see, e.g., Parmenter*, 149 N.H. at 46-47, the trial court's error was plain.[3] *See State v. Pandelena*, 161 N.H. 326, 331 (2010) (defining what causes error to be plain). Further, because the sentence is illegal to the extent that the trial court exceeded its authority under RSA 651:2, the third and fourth elements of the plain error rule have been satisfied. *State v. Matey*, 153 N.H. 263, 266 (2006). Accordingly, we reverse that portion of the sentence that imposed the no-contact order.

> *Convictions affirmed; sentence affirmed in part and reversed in part.*

DALIANIS, C.J., and CONBOY, LYNN, and BASSETT, JJ., concurred.

---

[2] To the extent that the State argues that *Smith* is factually similar to this case, we note that in *Smith* the no-contact order was first imposed as a condition of a *suspended* sentence, not as a condition of a term of imprisonment, which is factually distinct from the present matter. *Smith*, 163 N.H. at 15-16.

[3] We note that our holding today does not prevent those listed in the no-contact order from pursuing alternative remedies to prevent the defendant from contacting them. We also note that our holding does not address the issue of the Department of Corrections' authority to place limitations on the defendant's contact with third persons, including those covered by the trial court's no-contact order, while he serves his sentence.