NOTICE:  This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press.  Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Strafford
No. 2013-0489


THE STATE OF NEW HAMPSHIRE

v.

CHRISTINA THOMAS

Argued:  September 10, 2015
Opinion Issued:  February 23, 2016


Joseph A. Foster, attorney general (Lisa L. Wolford, assistant attorney general, on the brief and orally), for the State.


Thomas Barnard, senior assistant appellate defender, of Concord, on the brief and orally, for the defendant.


LYNN, J.  The defendant, Christina Thomas, appeals her conviction, following a jury trial in Superior Court (Lewis, J.), of first degree assault for knowingly causing serious bodily injury to a person under 13 years of age.  See RSA 631:1, I(d) (2007).  She argues that the trial court erred by: (1) admitting evidence of "other bad acts" committed against the victim and the victim's mother; and (2) not striking other testimony that she contends was inadmissible and prejudicial.  We affirm.

The pertinent facts are as follows. In 2002, the defendant reconnected with E.A., a childhood friend. Shortly thereafter, E.A. moved in with the defendant and her family. In August 2003, E.A. gave birth to D.A. and continued residing with the defendant, who promised to help take care of the child. E.A. and D.A. lived with the defendant until 2010, when D.A. was removed from the home and E.A. left. During that time, several other individuals lived in the home, including the defendant's husband, the defendant's boyfriend, her six children, and several friends and acquaintances. E.A. and D.A. also spent time at the home of the defendant's mother, Peggy Starr.

When E.A. first moved in, she got along well with the defendant. Over time, and specifically after D.A. was born, the relationship deteriorated. After giving birth, E.A. weighed close to 400 pounds and was told by a doctor that she needed to lose weight. The defendant promised to help in this endeavor, and the two went on a diet and exercised together. Eventually, the defendant stopped being supportive and instead used forced exercise and the denial of food to punish E.A. E.A. had to run up stairs in the home; if she did not, or if she did not do so quickly enough, the defendant would hit her or not allow her to eat. E.A. would also be deprived of food if she did not complete chores that the defendant asked her to do. E.A. lost a significant amount of weight during this time, and ultimately weighed approximately 130 pounds when she left the home.

During this time, E.A. began to steal food, which prompted the defendant to lock the cabinets and refrigerator. The other adults and children in the home would report to the defendant if E.A. had eaten food without the defendant's permission. If she was caught, the defendant would hit her. E.A. was not allowed inside the house if the defendant was not home and was required to wait outside, regardless of the weather. For a period of time, she could not use the bathroom in the house or sit on the furniture, and the defendant often took away E.A.'s mattress, pillow, and blankets. Sometimes when E.A. did something "wrong," the defendant put her in "timeout" and made her stand in the corner. The defendant also exercised control over E.A.'s money. E.A. received Social Security benefits (for which the defendant was the representative payee), food stamps, Temporary Assistance for Needy Families (TANF), and Women, Infants, and Children (WIC) benefits. The money and benefits were pooled for use by the household. Because E.A. had lost her driver's license, the defendant provided transportation for her and D.A. Starr also abused E.A. She or the defendant would beat E.A. for not running up the stairs, taking food, lying, not doing chores, or being obstinate or disobedient.

D.A. received similar treatment. He was hit or spanked, often with a board or a spatula, which left a scar on his leg. Purportedly to keep him from

2

getting into things, D.A. was put in his crib with a piece of Sheetrock over it, tied to a bunk bed with a leash, or kept in a dog crate in the basement or an outdoor dog kennel, sometimes for hours at a time. The dog crate was also used for punishment. If D.A. soiled himself, he was washed with cold water, including one time during the winter when he was placed in a stream outdoors. On other occasions, he was placed in a snowbank or left outside on the porch in a trash bag. Nearly everyone in the household used racial slurs to refer to D.A.

E.A. participated in the abuse of her son. At the direction of the defendant or Starr, E.A. would hit D.A. with her hands or a spatula, put him in the dog crate, or tie him to the bed. If E.A. did not do as she was directed, she was beaten. Other than doing as she was told by the defendant or Starr, E.A. had little interaction with D.A. At first, this was by choice, but eventually she was not allowed to have contact with him. If E.A. did something for D.A. without the defendant's or Starr's permission, such as trying to feed him, both E.A. and D.A. were hit. The defendant acted as D.A.'s primary caretaker and held herself out to others as his guardian. D.A. called the defendant "mom" and addressed E.A. by her name.

For the first year of his life, D.A. was fed formula and grew normally. Around the time he turned two years old, D.A. began "ruminating," meaning he would regurgitate food into his mouth, chew it, and swallow it again. He would also vomit food out of his mouth. These behaviors occurred almost every time he ate, at least several times per day. He also began eating such things as diesel fuel, his own feces, or animal feces. The defendant, who had assumed primary responsibility for feeding D.A., tried feeding him different foods to stop the ruminating and vomiting, but the problem continued. D.A.'s behaviors, particularly his ruminating, disgusted everyone at the house. The defendant believed that the behavior was intentional and began punishing D.A. for it, by hitting him or withholding food, occasionally for days at a time. D.A. was constantly hungry, but would not be fed if he screamed for food or cried about being hungry.

The defendant closely controlled what D.A. was fed. She told others in the house to ignore him when he cried or screamed for food. When D.A. began attending school in the fall of 2008, the defendant insisted that the school not provide D.A. with any food. She told school personnel that D.A. had "eating issues" and intimated that he had dietary restrictions, such as lactose or gluten intolerance. D.A. was always hungry and was fixated on food. The school attempted to arrange a consultation with a nutritionist, but the defendant did not allow it. The defendant would send D.A. to school with food, usually a peanut butter sandwich on gluten-free bread and carrot sticks, or tofu and vegetables. The defendant also told the school that D.A.'s ruminating was "learned behavior" and "voluntary," and requested that the teacher or

3

paraprofessional take away part of his snack every time he ruminated, misbehaved, or cried.  School personnel went along with the defendant's request at first, but eventually stopped.  In response to having his food taken away at school, D.A. started eating his lunch on the bus before school.  When this happened, the school would provide him with another lunch, even though the defendant insisted that D.A. not be given additional food so that he would "learn his lesson."  Because her instructions were not followed, the defendant removed D.A. from school in or around December 2009.

D.A. barely grew or gained weight.  In June 2004, when he was 10 months old, he was 29 inches tall and weighed 23 pounds, 2 ounces.  Two years later, when D.A. was almost three years old, he was 35 inches tall and weighed 22 pounds.  In March 2008, when he was four and one half years old, D.A. was 35 1/2 inches tall and weighed 22 pounds.  The average height for a child that age is 42 inches, and the average weight is 40-45 pounds.  Later that year he weighed less than 22 pounds.  In April 2010, when he was about six and one half years old, D.A. weighed 23 pounds, six ounces — only four ounces more than he weighed when he was 10 months old.  He was also developmentally delayed.

The New Hampshire Division for Children, Youth and Families (DCYF) received several reports of neglect and abuse of D.A. or E.A. between 2003 and 2010, but all were determined either to be unfounded or to not warrant investigation; no further action was taken until 2010, when D.A. was removed from the defendant's home and placed in DCYF custody.  One report was made in February 2008 by a WIC employee who was concerned that D.A. was losing weight.  The employee also contacted D.A.'s primary care physician, Dr. Christo, at Portsmouth Family Practice.  An employee of DCYF then met with D.A., E.A., and the defendant.  The defendant told DCYF that D.A. had an upcoming appointment with Christo.

D.A. had been seen at Portsmouth Family Practice in June 2006 by a physician's assistant, who, concerned with D.A.'s height and weight, requested blood work and scheduled a follow-up appointment for a few weeks later.  The defendant did not bring D.A. to the laboratory for the blood work or keep the follow-up appointment.  D.A. did not return until March 2008, following the meeting with WIC and DCYF.  The defendant told Christo that D.A. ate "very well" and did not mention his vomiting.  Unable to determine a cause for D.A.'s failure to grow, Christo referred D.A. to a pediatric endocrinologist.  In May and June of 2008, D.A. was seen by an endocrinologist and a gastroenterologist at Dartmouth-Hitchcock Medical Center, who were also unable to discover the cause of D.A.'s "failure to thrive," that is, his failure to grow.  Following his June appointment, the doctors requested that D.A. return in four weeks; however, the defendant did not bring him back until November.

4

After further tests and an endoscopy revealed no abnormalities, D.A. was admitted to Dartmouth-Hitchcock and held for observation for about four days in September 2009. He was evaluated by a number of specialists, fed through a feeding tube, and allowed to eat on his own. The doctors could not determine a physical or psychological reason for D.A.'s failure to thrive. D.A. gained three or four pounds during the few days that he was at the hospital and was discharged with instructions that he "should continue to receive regular meals and snacks. He should not be restricted from eating. If he continues to ruminate, . . . this is not related to an illness, and he should be fed whenever he is hungry and at regular mealtimes."

D.A. was next seen at Boston Children's Hospital in December 2009. For the first time, the defendant reported that D.A. "had severe behavioral issues," and Christo sought psychiatric referrals. Eventually, D.A. was admitted to Maine Medical Center in April 2010 and saw Dr. Ricci, a board certified child abuse pediatrician. The defendant told Ricci that D.A. was "suffering from some kind of psychiatric disorder" or "rumination disorder," had a number of food allergies, and was unable to eat several kinds of foods. Ricci observed that D.A. had no problem eating and that he had scars from an inflicted injury, which indicated physical abuse. Ricci was also concerned by Starr's treatment of and attitude toward D.A., and by the defendant's insistence that D.A. be discharged from the hospital.

Ricci concluded that D.A. had been starved as well as psychologically and physically tortured by his caregivers. He diagnosed D.A. with environmental "failure to thrive," which means the failure to gain weight or grow, and with "psychosocial dwarfism," which is a secondary diagnosis present in some cases of failure to thrive in which the child is psychologically neglected or abused in addition to being underfed. D.A.'s failure to gain height, in addition to his failure to gain weight, and the fact that he grew substantially after being fed, indicated that he suffered from psychosocial dwarfism in addition to failure to thrive. Ricci testified that rumination itself could not be enough to cause D.A.'s failure to thrive, and that psychosocial dwarfism is not associated with simply the deprivation of enough food. In his 30 years of experience, D.A.'s case "was the most profound, chronic, long-term case of failure to thrive that [Ricci had] ever seen in a child who was still alive." Ricci testified that "this type of starvation over a period of several years has both short term and long term[] adverse effects on children's development," and had the starving continued, D.A. "could have died." Ricci opined that doctors who had previously examined D.A. had failed to properly diagnose D.A. because, as doctors are trained to do, they accepted the history provided by the defendant as true; namely, that D.A. had behavioral issues and food allergies or sensitivities.

Ricci prohibited the defendant and Starr from having access to D.A. During his two-week hospitalization, D.A. was fed through a tube, then put on

5

a regular diet; he gained eight pounds.  He demonstrated no allergies or intolerances to foods, did not vomit or ruminate, and did not display any behavioral issues.  When Ricci last saw D.A. in October 2010, he had gained 23 pounds and grown five and one half inches.  By February 2013, D.A. had gained another eight pounds and grown over a foot.

II

The defendant was indicted on one count of first degree assault.  The indictment alleged that the defendant "did knowingly cause serious bodily injury to D.A. [then age 8], by failing to provide proper nutrition to D.A., causing 'failure to thrive' to D.A., and [the defendant] did owe a duty of care to D.A. as she was D.A.'s acting primary caretaker."

Prior to trial, the State moved to admit evidence of uncharged bad acts the defendant committed against D.A. and E.A, see N.H. R. Ev. 404(b), and proffered numerous instances of abuse, as detailed above.  The State argued that evidence pertaining to E.A., who would be a key witness at trial, was necessary for the purpose of assessing her credibility.  The State also argued that evidence of the power dynamic between E.A. and the defendant was relevant to show why E.A. allowed the defendant to be D.A.'s primary caretaker, and why E.A. "did not intervene on the child's behalf, report the abuse to the police, and/or simply leave the residence."  During the motion hearing, the State further argued that the abuse of E.A. was inextricably intertwined with the abuse of D.A.

Noting that it had the burden to prove that the defendant acted knowingly in failing to provide D.A. with proper nutrition, the State argued that the evidence of bad acts against D.A. other than the deprivation of food was "relevant to and probative of [the defendant's] intent toward the child," and, therefore, relevant to her intent with respect to the charged crime.  The State contended that the defendant's intent would be "the central issue at trial" because she "was taking D.A. to doctors at the same time she was depriving him of food."  Without evidence of the defendant's physical and emotional abuse of D.A., the State argued, "the jury would likely come to the conclusion that the Defendant was doing everything she could to help the child and that the child's physical condition was due to a misunderstanding."  To support its argument, the State pointed to the assertion made in one of the defendant's pleadings that she "did everything in her power to take care of the child."  The State also argued that the significant probative value of evidence of uncharged acts against both E.A. and D.A. was not substantially outweighed by the danger of unfair prejudice.

The defendant objected, citing Rule 404(b).  Although she conceded that evidence pertaining to uncharged bad acts directed against E.A. was relevant, she argued that the evidence pertaining to uncharged acts against D.A. was not

6

relevant because "[c]onduct not relating to the alleged deprivation of food is not . . . relevant to whether or not the defendant was 'aware her conduct of failing to provide proper nutrition to D.A. would result in serious bodily injury to D.A.', or that it was her intent to cause such injury." For evidence relating to both E.A. and D.A., the defendant argued that the probative value was "not of such significance as to outweigh the terrible prejudice that would be done to the defendant."

After the hearing, the trial court granted the State's motion. The court found that evidence of acts against D.A. other than the withholding of food was relevant to the defendant's mental state because "if [the defendant] was otherwise mistreating the child, that . . . is relevant to what was going on in [the defendant's] head in connection with . . . nutritional deprivation." The court stated that its reason for admitting evidence of acts against D.A. was for the State to prove the "knowing prong" of its case. The court found evidence pertaining to E.A. relevant because the alleged bad acts "involve[d] the boy and the nutritional needs," and identified the "knowing prong" and credibility issues as the reasons the evidence was admitted. Although the evidence was prejudicial, the court found that it was "extremely probative." The court stated: "[I]t's impossible . . . for this case to be tried fairly to [the] State, which is where my focus has to be, without dealing with . . . all these events . . . which are inextricably related to one another. It's not possible to really try this case sensibly without getting into it all."

After a 12-day trial, the defendant was convicted and sentenced. This appeal followed.

III

On appeal, the defendant argues that the trial court erred by admitting evidence of uncharged bad acts against E.A. and D.A. because: (1) the acts were not "inextricably intertwined" with the charged crime; (2) the acts against D.A. were not relevant to show her intent or motive; and (3) the danger of unfair prejudice substantially outweighed the probative value of the acts.

A

First, we conclude that it is unnecessary for us to determine whether the other acts at issue were "inextricably intertwined" with the charged crime. We have distinguished between "extrinsic" evidence of other crimes, wrongs, or acts, which is governed by Rule 404(b), and "intrinsic" evidence, which is not. See State v. Wells, 166 N.H. 73, 77 (2014). "Other act evidence is 'intrinsic,' and therefore not subject to Rule 404(b), when the evidence of the other act and the evidence of the crime charged are 'inextricably intertwined' or both acts are part of a single criminal episode or the other acts were necessary preliminaries to the crime charged." Id. (quotations omitted). Although the

trial court stated that the events the State sought to admit were "inextricably related to one another," the court nonetheless engaged in a Rule 404(b) analysis. This demonstrates that the court did not consider the evidence to be intrinsic. In light of the trial court's treatment of the evidence, we will assume that it is extrinsic to the charged crime and analyze its admissibility under Rule 404(b).

Such an analysis is more beneficial to the defendant because, although intrinsic evidence must meet the balancing test of Rule 403, id. at 79; N.H. R. Ev. 403, evidence governed by Rule 404(b) must meet the same balancing test as well as the other prongs of a Rule 404(b) analysis, see State v. Roy, 167 N.H. 276, 287-88 (2015) (listing the three prongs of the Rule 404(b) test and noting that the third prong "involves the same analysis as that conducted pursuant to Rule 403"). We turn, then, to Rule 404(b) and the defendant's remaining arguments.

B

Rule 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

N.H. R. Ev. 404(b). "The purpose of the rule is to ensure that an accused is tried on the merits of the crime charged and to prevent a conviction that is based upon propensity and character inferences drawn from evidence of other crimes or wrongs." State v. Addison (Capital Murder), 165 N.H. 381, 463 (2013).

Before admitting evidence under Rule 404(b), a trial court "must first determine: (1) that the evidence is relevant for a purpose other than character or disposition; (2) that there is clear proof that the defendant committed the prior act; and (3) that the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice to the defendant." Roy, 167 N.H. at 287 (quotation omitted). "The State bears the burden of demonstrating the admissibility of prior bad acts." State v. Beltran, 153 N.H. 643, 647 (2006). "We review the trial court's ruling for an unsustainable exercise of discretion, and will reverse only if it was clearly untenable or unreasonable to the prejudice of the defendant's case." Id. Here, the defendant raises arguments under only the first and third prongs of the Rule 404(b) test.

8

To meet its burden under the first prong, "the State is required to specify the purpose for which the evidence is offered and articulate the precise chain of reasoning by which the proffered evidence will tend to prove or disprove an issue actually in dispute, without relying upon forbidden inferences of predisposition, character, or propensity." State v. Howe, 159 N.H. 366, 376 (2009) (quotation omitted). "That chain of reasoning must demonstrate a sufficient logical connection between the prior acts and the permissible purpose for which the State offers the evidence." Id. (quotation omitted). "To be relevant, prior bad acts must be in some significant way connected to material events constituting the crime charged and not so remote in time as to eliminate the nexus." Beltran, 153 N.H. at 647-48. "Should the trial court rule the evidence admissible, it must articulate for the record the theory upon which the evidence is admitted, without invoking propensity, and explain precisely how the evidence relates to the disputed issue." Addison, 165 N.H. at 464.

The State argues that the defendant has waived any challenge to the evidence involving E.A. because she did not object to the evidence under the first prong of Rule 404(b), and, in fact, agreed that the evidence was relevant. In her objection filed in the trial court, the defendant "concede[d] the relevance of the alleged bad acts of the defendant against the child's mother, without conceding any other aspects of the argument." During the hearing, defense counsel stated: "I'm not arguing the relevance of the issues involving alleged abuse against E.A. by my client." Because "[t]he general rule is that a contemporaneous and specific objection is required to preserve an issue for appellate review," State v. Towle, 167 N.H. 315, 326 (2015), we conclude that the defendant's argument as to the relevance of bad acts by the defendant against E.A. is waived. However, her argument as to the relevance of acts against D.A., as well as her argument under the third prong of Rule 404(b), is preserved for our review.

The trial court found that the evidence relating to D.A. was relevant to the defendant's mental state and whether she acted knowingly. Because the defendant was charged with knowingly causing serious bodily injury to D.A. by failing to provide him with proper nutrition, the State had the burden to show that she acted with this mental state, and not negligently or mistakenly. We thus agree that this evidence was relevant to show the defendant's intent, knowledge, or absence of mistake or accident, see N.H. R. Ev. 404(b), because it demonstrated her attitude and behavior toward D.A., which the jury could find was more consistent with knowingly starving him than doing so negligently or mistakenly. See N.H. R. Ev. 401 ("'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.").

9

The defendant asserts that "intent" under Rule 404(b) is synonymous with "purpose," and because the State had to prove only that the defendant acted knowingly and not purposely, the evidence of other bad acts was not relevant to her intent. The defendant contends that, "as a general matter, other acts evidence is relevant to prove a defendant's 'intent' only if the defendant is charged with acting with a specific purpose." Although the State asserts that this argument is not preserved for our review because it was not presented to the trial court, see State v. Noucas, 165 N.H. 146, 152 (2013), we will address its merits.

The defendant correctly notes that, when determining the mens rea requirement for an offense, we have equated "intentional" with "purposeful." See State v. Pond, 132 N.H. 472, 475 (1989) (stating that we had previously concluded that "intentionally" was synonymous with "purposely," and therefore, purposely was the mens rea for the offense at issue). However, we have also explained that, based upon its common law ancestry, the mental state of "knowingly" corresponds to the concept of possessing general, rather than specific, criminal intent. See State v. Ayer, 136 N.H. 191, 194 (1992) ("In general, however, 'purpose' corresponds loosely with the common-law concept of specific intent, while 'knowledge' corresponds loosely with the concept of general intent." (quotation omitted)).

We conclude that, for purposes of Rule 404(b), "intent" can entail any mental state that the proponent of the evidence may seek to prove. See Velez v. State, 762 P.2d 1297, 1313 (Alaska Ct. App. 1988) (Bryner, C.J., dissenting) ("Rule 404(b) uses the word 'intent' as a convenient form of shorthand to denote any aspect of the accused's culpable mental state that is included as an element of the prosecution's case[.]"), superseded by rule; 22A C. Wright & K. Graham, Federal Practice and Procedure: Evidence § 5242, at 313 (2012) ("The 'intent' exception [under Rule 404(b)] should be read broadly so as to cover any required mental element of the crime whether malice or knowledge or the absence of mistake, accident, duress or intoxication." (footnotes omitted)). In a number of our cases, we have upheld the admission of evidence, pursuant to Rule 404(b), as relevant to intent for crimes that required the State to prove that the defendant acted with a mental state other than purposely. See, e.g., Addison, 165 N.H. at 466-67 (upholding admission of prior bad acts to prove intent or motive when the charged crime required proof that defendant acted knowingly); Howe, 159 N.H. at 376-77 (holding that evidence of other bad acts was relevant to intent — that the defendant knowingly possessed child pornography — and relevant to lack of mistake or accident).

Here, because the State was required to prove that the defendant acted knowingly, the trial court could properly admit evidence pursuant to Rule 404(b) that was relevant to her general (knowing) or specific (purposeful) intent to commit the charged crime. Cf. RSA 626:2, III (2007) (stating that when the law provides that "acting knowingly suffices, the element is also established if a

10

person acts purposely"); Roy, 167 N.H. at 287-88 (upholding the admission, pursuant to Rule 404(b), of evidence that showed that the defendant acted purposely for a crime that required proof that he acted recklessly).

The evidence of the other forms of abuse that the defendant perpetrated against D.A. during the same period that she was depriving him of proper nutrition was relevant to whether she committed the latter conduct knowingly. It tended to show that her failure to provide D.A. with proper food was not the result of accident, inadvertence, or a lack of understanding of the nutritional needs of a young child, but rather was part of an obvious and deliberate pattern of abuse of D.A.

C

The defendant next argues that the trial court erred in its analysis under the third prong of Rule 404(b). Under this prong, evidence of bad acts "is admissible if the danger of unfair prejudice to the defendant does not substantially outweigh the probative value of the evidence." Beltran, 153 N.H. at 649. "We accord considerable deference to the trial court's determination in balancing prejudice and probative worth under Rule 404(b)." Id. "To prevail, the defendant must show that the trial court's ruling was clearly untenable or unreasonable to the prejudice of [her] case." Id.

"First, we consider the probative value of the evidence." Howe, 159 N.H. at 378 (quotation omitted). "Determining the probative value of evidence entails analyzing how relevant it is." Id. (quotation omitted). "Relevant evidence may have limited probative value." Id. (quotation omitted). Here, as the trial court found and as we describe above, the other act evidence pertaining to D.A. was highly relevant to the defendant's mental state — that she acted knowingly; and the other act evidence pertaining to E.A. was highly relevant both to the defendant's mental state and to E.A.'s credibility.

"Next, we consider whether the danger of unfair prejudice to the defendant from admission of this evidence substantially outweighed its probative value." Id. (quotation omitted). "Evidence is unfairly prejudicial if its primary purpose or effect is to appeal to a jury's sympathies, arouse its sense of horror, or provoke its instinct to punish, or trigger other mainsprings of human action that may cause a jury to base its decision upon something other than the established propositions in the case." Beltran, 153 N.H. at 649. "It is not, however, evidence that is merely detrimental to the defendant because it tends to prove [her] guilt." Id.

Although the balancing of prejudice and probative value cannot be reduced to a precise formula, we consider several factors, including: (1) whether the evidence would have a great emotional impact upon a jury; (2) its potential for appealing to a juror's sense of resentment or outrage; (3) the

extent to which the issue upon which it is offered is established by other evidence, stipulation, or inference; and (4) whether the evidence is relevant to prove an issue that is actually in serious dispute. Addison, 165 N.H. at 464. "We have repeatedly emphasized that whether the evidence is relevant to prove an issue that is actually in serious dispute is particularly important to the calculus." Id. Additionally, our analysis "generally focuses upon the content of the evidence, not its volume." Id. at 470. "While evidence of a prior offense or bad act is always prejudicial, the prejudice is frequently outweighed by the probative value of the evidence when the defendant's knowledge or intent is a contested issue in the case." Howe, 159 N.H. at 378 (quotation and brackets omitted).

The challenged evidence here was probative of the defendant's knowledge or intent, which was highly contested at trial. As we have stated: "When intent is in serious dispute, the trial court is justified in assigning a high probative value to other bad acts evidence that tends to prove criminal mens rea with respect to the charged act." Addison, 165 N.H. at 465. Much of the evidence was also probative of the defendant's role as D.A.'s primary caretaker and her duty to care for him, which was another contested issue in the case. The State had the burden to show both that the defendant acted knowingly and that she had a duty to care for D.A. See id. ("When a culpable mens rea is an element of the charged offense and the defense has not conceded the element, the issue of intent is sufficiently disputed as to require evidence at trial.").

We have also recognized that "[b]ecause persons rarely explain to others the inner workings of their minds or mental processes, one's culpable mental state must, in most cases, be proven by circumstantial evidence, and the fact finder may draw relevant inferences on the issue of intent from an accused's conduct." Id. (quotation and ellipsis omitted). Although there was little doubt that the evidence would have an emotional impact on the jury, because the evidence was highly probative of matters that were actually in dispute and that could not readily be established by other evidence, we conclude that the trial court did not unsustainably exercise its discretion in finding that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice to the defendant.

IV

The defendant also argues that the trial court erred by not striking evidence of: (1) an incident when the defendant was watching a friend's child and the child ran into the road and was nearly hit by a vehicle; (2) the defendant's extramarital affair and the fact that her boyfriend, not her husband, was the father of some of her children; and (3) a psychologist's expert opinion that the defendant was dishonest, impulsive, self-centered, and narcissistic, lacked empathy, and was unwilling to accept responsibility for her actions. Because the defendant did not challenge this evidence at trial, she

12

raises these issues as plain error.  See Sup. Ct. R. 16-A ("A plain error that affects substantial rights may be considered even though it was not brought to the attention of the trial court or the supreme court.").

"For us to find plain error: (1) there must be error; (2) the error must be plain; and (3) the error must affect substantial rights."  State v. Pinault, 168 N.H. 28, 33 (2015) (quotation omitted).  "If all three of these conditions are met, we may then exercise our discretion to correct a forfeited error only if the error meets a fourth criterion: the error must seriously affect the fairness, integrity or public reputation of judicial proceedings."  Id. at 33-34 (quotation omitted).  "The plain error rule is used sparingly, however, and is limited to those circumstances in which a miscarriage of justice would otherwise result."  Id. at 34 (quotation omitted).

Because the defendant did not object to the challenged testimony, and the trial court made no ruling on its admissibility, "the pertinent question is whether the trial court erred in failing sua sponte to strike that testimony."  State v. Rawnsley, 167 N.H. 8, 12 (2014) (quotation and brackets omitted).  "We have never held that a trial court must sua sponte strike" a witness's testimony.  Id. (quotation omitted).  A trial court might have that obligation "when there could be no dispute that certain testimony impaired the defendant's substantial rights and adversely affected the fairness, integrity, or public reputation of judicial proceedings," id.; this case, however, does not present such a situation.

"What is often overlooked in the rote application of the plain error standard is that, without objection, it is almost impossible to conclude that the trial court committed error at all."  Id. at 13 (quotation and brackets omitted).  "[D]efense counsel can waive evidentiary restrictions, and often has legitimate strategic reasons for doing so."  Id. (quotation omitted).  "Under those circumstances, reviewing admission of evidence for plain error can serve to transform defense counsel's strategic decisions into trial court errors."  Id. (quotation, brackets, and ellipsis omitted).  "In this way, trial counsel's sound strategy becomes plain error at appellate counsel's urging."  Id. (quotation, brackets, and ellipsis omitted).

Here, defense counsel may have had strategic reasons for not objecting to the three items of testimonial evidence at issue.  First, a witness who lived in the defendant's home for a few months testified that while the defendant was supposed to be watching his daughter, the child ran into the street and was nearly struck by a vehicle.  This incident caused a falling out between the witness and the defendant, which resulted in him moving out.  The defendant argues that this evidence was inadmissible under Rule 404(b) because its only purpose was to show her propensity to engage in the charged conduct — neglecting a child.  However, at trial, defense counsel stated that many of the State's witnesses had "an ax to grind" against the defendant.  This testimony

13

would serve the strategic purpose of demonstrating that witness's bias or animus toward the defendant. Additionally, because the defendant was charged with knowingly, not negligently, committing the crime, this evidence did not demonstrate a propensity to engage in the charged conduct. Instead, it could be used for another strategic purpose by the defense; that is, to show that the defendant was merely negligent in failing to care for D.A. or other children, and did not do so knowingly.

Second, the State elicited testimony from a number of witnesses that the defendant's boyfriend, or former boyfriend, who lived in the defendant's home, was the father of some of her children. This occurred while she was married to her husband, who later found out and allowed the boyfriend to continue living in the home. The defendant argues that this evidence is prohibited by Rule 404(b) because it was offered only to show her bad character. Again, however, defense counsel may have declined to object to this testimony because he saw strategic reasons for its admission — it showed that there were many adults living in the home, and that this particular individual was a permanent member of the family who had an interest in caring for the children. It thus supported defense counsel's argument at trial that the defendant was not the only one in charge of caring for and feeding the children in the home.

Third, a clinical psychologist, Dr. Halla, testified that he evaluated the defendant and E.A. and administered tests including a "Child Abuse Potential Inventory," a personality test, and a "Parenting Stress Index." The tests have "validity scales," which measure whether an individual is trying to appear a certain way. Halla testified that the defendant's results were invalid on three of the five tests he administered to her, indicating deception or defensiveness. He concluded that she had "tendencies toward impulsive, self-centered, narcissistic behavior," had a limited ability for empathy, and "was unwilling to accept responsibility" for her actions. Halla testified similarly about E.A. The defendant argues that this evidence was inadmissible under Rule 404(a)(1) because the State may not introduce evidence of a defendant's negative character traits except in rebuttal. See N.H. R. Ev. 404(a)(1). Defense counsel may have wanted Halla's testimony admitted, however, to undermine E.A.'s credibility or to suggest that she was more responsible for D.A.'s condition.

In addition to these potential strategic purposes, which we are hesitant to second-guess on appeal and label as error, the defendant has failed to demonstrate plain error because the evidence of her guilt was overwhelming. Even if we were to assume that there was error and that it was plain, the error must affect substantial rights. See Pinault, 168 N.H. at 33. To meet this third prong, "the defendant must demonstrate that the error was prejudicial, i.e., that it affected the outcome of the proceeding." Id. at 34 (quotation omitted). "We will find prejudice under the third prong when we cannot confidently state that the jury would have returned the same verdict in the absence of the error." State v. Mueller, 166 N.H. 65, 70 (2014). Given the record before us, we are

14

confident that the jury would have returned the same verdict even if it had not heard any of the three items of evidence discussed above. Accordingly, we conclude that the defendant has failed to demonstrate that the trial court committed plain error.

Affirmed.

DALIANIS, C.J., and HICKS, CONBOY, and BASSETT, JJ., concurred.