NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Belknap
No. 2017-0712

THE STATE OF NEW HAMPSHIRE

v.

GEORGE J. COLBATH

Argued: November 6, 2018
Opinion Issued: January 8, 2019

Gordon J. MacDonald, attorney general (Heather A. Cherniske, attorney, on the brief and orally), for the State.

Sisti Law Offices, of Chichester (Mark L. Sisti on the brief and orally), for the defendant.

HICKS, J. The defendant, George J. Colbath, appeals his convictions, following a six-day jury trial, on 17 charges of aggravated felonious sexual assault (AFSA). See RSA 632-A:2, I(d), III (2016), V (2016) (amended 2017); see also RSA 631:2-b, III (2016). On appeal, he argues that the Superior Court (Fauver and Smukler, JJ.) erred by admitting evidence of certain uncharged conduct pursuant to New Hampshire Rule of Evidence 404(b). He also argues that the Superior Court (Smukler, J.) erred by allowing two witnesses to testify about statements that he allegedly made about the victim's appearance. We affirm.

The jury could have found the following facts. The victim was born in December 1998. Her parents separated when she was an infant, and she and her mother moved to New Hampshire, where her mother met and married the defendant. The victim's mother died in November 2009, shortly before the victim turned 11.

When the victim was in sixth grade, she and the defendant moved to Nottingham to live with his then-girlfriend and her children. The first incident of sexual contact between the victim and the defendant occurred when she was in eighth grade. Upon arriving home from a party, the victim noticed "liquid" in her underwear. Because she did not know what it was, she asked the defendant about it, "and he wanted [her] to show him." While in the bathroom, the victim showed the defendant her underwear. The defendant "proceeded to examine [her] vagina," and remarked that her vagina looked like her mother's. The defendant told the victim that she "must have excited [herself] in some way."

The next incident occurred when the victim and the defendant were watching a movie together at home. The defendant asked the victim if she had ever masturbated, and, when she said that she had not, he said that he wanted to show her how to "make [herself] feel good." The defendant then removed the victim's underwear and digitally penetrated her.

One day, when the victim was sleeping, she awoke to the defendant pulling her shirt down and touching her breasts. She confronted him about this on a different day and "he said that he couldn't help himself."

Shortly after the first movie incident occurred, a second incident occurred while the victim was watching a movie in her bedroom. The defendant entered her bedroom, lay down next to her, and began to watch the movie with her. As he did so, he moved his hand up her leg, close to her vagina. The defendant indicated that he wanted to digitally penetrate her again, but the victim said that she "didn't want . . . to." Nonetheless, the defendant digitally penetrated the victim and then performed cunnilingus.

In the summer between eighth and ninth grade, the defendant and his girlfriend broke up, and he and the victim moved to Alton. When the victim and the defendant were moving some belongings into the Alton home, he gave her "a small vibrator in a white satin bag." He told the victim that he wanted to use it on her. He then proceeded to do so and again digitally penetrated her and performed cunnilingus. The defendant then penetrated the victim's vagina with his penis for the first time. The victim was angry with the defendant "because he had said he would never, ever put his penis inside of [her]."

Once the defendant and the victim began living in Alton, he began penetrating her vagina with his penis "almost weekly." The defendant engaged in the same pattern of conduct whenever he penetrated her vagina with his penis: he would make the victim undress and lie down, then he would digitally penetrate her, perform cunnilingus, and insert his penis into her vagina. The defendant also penetrated the victim's anus with his penis "a couple of times."

The victim turned 16 in December 2014. In June 2015, she and the defendant moved to Center Barnstead to live with the defendant's now wife, Suzanne. In the beginning of the school year that began in August 2015, the victim became friends with a girl with whom she commuted to a vocational high school. This friend was the first person in whom the victim confided about the sexual incidents with the defendant. The victim had not previously disclosed them because she feared that, if she did so, she might lose her place to live, either because "the State would take [her]" or because the defendant would "ship[ ] [her] off to Alabama to live with [her] real father."

After the victim confided in her friend, the defendant continued to assault the victim on a weekly basis. The assaults included penetrating the victim digitally, performing cunnilingus, inserting his penis into her vagina and anus, using vibrators on her and on himself, and forcing her to perform fellatio. To force the victim to engage in sex acts with him, the defendant would take away her privileges, such as her phone or her car, or threaten to sell her beloved horses. The defendant would often tell the victim that he was "all that [she] had."

Shortly after the victim turned 17, the defendant "made [her] have sex with him," and she "told him that if he keeps it up, [she] was going to have to eventually tell . . . somebody about it because [she] couldn't handle . . . holding the secret anymore." The defendant told her to "go ahead and tell somebody" because "they [wouldn't] believe [her]."

By the end of January 2016, Suzanne had noticed that the victim "had been acting more short and tense with [the defendant]." On January 30, Suzanne asked the victim if she "had ever been molested by a close family member," and the victim "kind of lost it." She "broke down," crying, and told Suzanne that she "couldn't tell her." Eventually, however, the victim told Suzanne about the defendant's conduct. When Suzanne confronted the defendant, he said that "he wasn't going to go to jail for this." He then left the home, and, as he left, threatened to kill himself. After he left the home, the defendant telephoned Suzanne, telling her that he had taken "something" and that "he was going to kill himself." The defendant hung up on Suzanne, but before doing so said that he was going to destroy his phone.

A Belknap County Grand Jury indicted the defendant on 17 counts of AFSA. All of the charges alleged incidents occurring in Belknap County (e.g.,

3

Alton or Center Barnstead).  Four of the charges alleged that the defendant had engaged in a pattern of AFSA between September 1, 2014, and December 6, 2014.  See RSA 632-A:2, III.  The remaining 13 charges alleged that the defendant coerced the victim to submit to discrete acts constituting AFSA by threatening retaliation and that the victim believed that he had the ability to execute those threats.  See RSA 632-A:2, I(d).  Several of those charges included the allegation that the victim and the defendant were family or household members.  See RSA 632-A:2, V; see also RSA 631:2-b, III.

Before trial, the State filed a motion in limine to admit the Nottingham incidents into evidence.  The trial court granted the motion over the defendant's objection.  The trial court determined that the Nottingham incidents were relevant to demonstrate "the defendant's plan, preparation, and intent to commit the alleged crimes."

During the trial, the trial court admitted into evidence, over the defendant's objection, the victim's aunt's testimony that, "[a] few times," the defendant made comments to the aunt about what the victim "looked like and her body."  Specifically, the aunt testified that the defendant described the victim as "very well[-]endowed like her mother," and "built like a brick shit house."

The trial court also admitted into evidence, over the defendant's objection, the testimony of his adult son that, when the victim was in "early adolescence" and living in Nottingham, the defendant had remarked to his son: "[Y]ou should see the tits on her."

After the son testified thusly, the trial court gave the jury the following instruction:

> Members of the jury, at the beginning of this case, I told you that there may be occasions where evidence is being introduced for a limited purpose and, if that came up, I would instruct you as it comes up.  This evidence was introduced for a limited purpose indeed.  I also want to make you aware that there has been some previous evidence, and I will tell you what it was.

> It was introduced for the same limited purpose, and the evidence you just heard involving statements of the defendant that occurred before the conduct charged in this case is being introduced for a limited purpose, not to show -- not for the purpose of showing that the defendant is of a particular character and that he acted in performance [sic] with the character but solely for the purpose of allowing you to assess -- and to be used to assess his mental state or intent at the time of the charged conduct.

4

So -- and that it pertains to the evidence you just heard, it pertains to similar evidence you heard previously by [the victim's aunt], and it pertains to evidence of conduct that occurred before the defendant moved to Belknap County, the conduct that occurred in Rockingham County specifically . . . Nottingham.

The trial court reiterated that limiting instruction when it issued its final jury instructions:

Some evidence was introduced for a limited purpose. Specifically, the State has offered evidence of the defendant's conduct and statements made when he and [the victim] lived in Nottingham . . . . If you find such evidence to be credible, you may consider it only for the limited purpose of determining whether the State has met it[s] burden of proving the defendant's mental state, that he acted knowingly. Evidence of similar acts may not be considered by you for any other purpose. Specifically, you may not use this evidence to infer that because the defendant committed the other acts, he must also have committed the acts charged in the indictments. The defendant is on trial only for the acts charged in the indictments. He is not on trial for committing acts that are not alleged in the indictments. You may not consider this evidence of similar acts as a substitute for proof that the defendant committed the crimes with which he is charged. Nor may you consider the evidence as proof that the defendant has a criminal personality, that he has a bad character, or that he has the propensity to commit the crime. The evidence of the other acts was admitted for a much more limited purpose and you may consider it only for that limited purpose.

II

On appeal, the defendant challenges certain of the trial court's evidentiary rulings. We review such challenges under our unsustainable exercise of discretion standard. See State v. Letarte, 169 N.H. 455, 461 (2016). "For the defendant to prevail under this standard, he must demonstrate that the trial court's decision was clearly untenable or unreasonable to the prejudice of his case." Id. (quotation omitted). "In applying our unsustainable exercise of discretion standard of review, we determine only whether the record establishes an objective basis sufficient to sustain the discretionary judgment made." Id. (quotation omitted). "Our task is not to determine whether we would have found differently, but is only to determine whether a reasonable person could have reached the same decision as the trial court on the basis of the evidence before it." Id. (quotation omitted).

5

A

The defendant first argues that the trial court erred by admitting evidence of the Nottingham incidents pursuant to Rule 404(b). Rule 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

N.H. R. Ev. 404(b). Before evidence of other bad acts may be admitted at trial, the State must demonstrate that: (1) such evidence is relevant for a purpose other than proving the defendant's character or disposition; (2) clear proof establishes that the defendant committed the other bad acts; and (3) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice to the defendant. State v. Addison (Capital Murder), 165 N.H. 381, 463 (2013). The trial court's evidentiary decision under this three-prong test lies within its sound discretion, and we will disturb its judgment only if the defendant shows that the decision was clearly untenable or unreasonable to the prejudice of his case. Id. The trial court is well-positioned to evaluate the particulars of a case, and we accord considerable deference to its conclusion as to the balance between probative worth and prejudicial impact. Id. Only the first and third prongs of the Rule 404(b) analysis are here at issue.

To satisfy the first prong of the Rule 404(b) analysis, the other bad act evidence "must have some direct bearing on an issue actually in dispute and have a clear connection to the evidentiary purpose for which it is offered." Id. at 464. The trial court found that evidence of the Nottingham incidents was relevant to the defendant's mental state and whether he acted knowingly. See State v. Thomas, 168 N.H. 589, 600 (2016).

Here, to establish that the defendant committed 13 of the 17 charges of AFSA, the State had to prove that he knowingly engaged in specific incidents of sexual penetration and that he knowingly coerced the victim to submit by threatening to retaliate against her, and that the victim believed that he had the ability to execute those threats in the future. See RSA 632-A:2, I(d). "A person acts knowingly with respect to conduct or to a circumstance that is a material element of an offense when he is aware that his conduct is of such nature or that such circumstances exists." RSA 626:2, II(b) (2016). Thus, to convict the defendant of those 13 charges, the State had to prove, beyond a reasonable doubt, that when he sexually penetrated the victim, he was aware that he was doing so and that when he threatened to retaliate against her, he was aware that his threats would be coercive in effect. See RSA 632-A:2, I(d).

6

"Convincing a jury of this mens rea beyond a reasonable doubt is a heavy burden, and we have recognized that the unlikelihood of developing direct testimony on the defendant's state of mind calls for consideration of all proper proof that can be proffered by the prosecution." Addison (Capital Murder), 165 N.H. at 466.

When, as in this case, the defendant does not concede intent and intent is an element of the crime to be proved by the State, intent "is sufficiently at issue to require evidence at trial." State v. Pepin, 156 N.H. 269, 279 (2007) (quotation omitted). Although in its pretrial ruling, the trial court determined that the incidents were admissible also to show the defendant's preparation and/or plan, at trial, the court twice instructed the jury that the incidents were introduced solely to prove the defendant's mental state and could not be considered by the jury for any other purpose. Although the defendant challenges the trial court's pretrial determination that the Nottingham incidents were relevant to show his preparation or plan, we do not address those arguments because, despite the trial court's pretrial ruling, the incidents were not admitted at trial for those purposes.

"To be relevant to intent, evidence of other bad acts must be able to support a reliable inference, not dependent on the defendant's character or propensity, that the defendant had the same intent on the occasions of the charged and uncharged acts." Id. at 277 (quotation omitted). "We will find sufficient support for a reliable inference of intent only if the defendant's intent in committing the other bad acts and the defendant's intent in the charged offenses [are] closely connected by logically significant factors." Id. (quotation omitted).

The defendant argues that, because the State had to prove only that he acted knowingly, and not purposely, evidence of the Nottingham incidents was not relevant to his intent. See Thomas, 168 N.H. at 600. However, we have previously upheld the admission of other bad act evidence under Rule 404(b) as relevant to intent for crimes requiring the State to prove that the defendant acted knowingly. See id. at 596, 602 (concluding that evidence of other forms of abuse that the defendant perpetrated against the victim was relevant to demonstrate that she knowingly caused the victim serious bodily injury when she failed to provide him with proper nutrition); see also Addison (Capital Murder), 165 N.H. at 466-67 (upholding admission of other bad act evidence because it was "highly probative" of the State's theory that, when the defendant shot a police officer, he "was aware that his actions would cause the death of a law enforcement officer who was acting in the line of duty"); State v. Howe, 159 N.H. 366, 376-77 (2009) (holding that evidence that the defendant sought out websites containing child pornography and that he regularly viewed such pornography was relevant to show that he knowingly possessed child pornography); State v. Richardson, 138 N.H. 162, 166 (1993) (deciding that evidence of the defendant's threatening behavior towards the victim and

7

towards another in her presence in the days immediately preceding the charged offense was relevant to and probative of his intent towards the victim and her own state of mind).

In the instant case, proof of the Nottingham incidents was relevant to show that, when the defendant sexually penetrated the victim, he was aware that he was doing so and that when he threatened to retaliate against her, he was aware that his threats would be coercive in effect. See RSA 632-A:2, I(d). That evidence made it more probable that, at the time of the charged incidents in Alton and Center Barnstead, the defendant knowingly coerced the victim by threatening to retaliate against her. See State v. Johnson, 130 N.H. 578, 582-84 (1988) (holding that evidence of prior sexual acts between the defendant and the victim were admissible under Rule 404(b) to demonstrate his use of implied threats to coerce the victim to submit to the charged sexual assaults). In addition, the fact that the Nottingham incidents occurred and that the victim did not report them to others made it more likely that the defendant would feel that it was "safe" to commit the charged acts, which in turn tended to show that he knew what he was doing when he acted.

The defendant next asserts that, because his propensity was an essential link in making evidence of the Nottingham incidents relevant to show intent, it was inadmissible under Rule 404(b). To the contrary, the Nottingham incidents and the charged offenses are closely connected by logically significant factors. The Nottingham incidents and the charged offenses were directed at the same victim and occurred in a similar context. See Pepin, 156 N.H. at 278; see also State v. Dukette, 145 N.H. 226, 230 (2000) (concluding that there was a sufficient logically significant connection between the defendant's alleged prior assault of the victim and the charged conduct in part because they both involved the same victim and a similar weapon, and they both occurred under similar circumstances).

The Nottingham incidents were not so remote in time as to eliminate the nexus between them and the charged assaults. See Dukette, 145 N.H. at 230. According to the victim's testimony, the Nottingham incidents began when she was in eighth grade, and the Alton assaults began the following summer. Compare State v. Cassavaugh, 161 N.H. 90, 98 (2010) (threat delivered two months before victim's murder was not so remote in time as to eliminate the requisite nexus between it and the charged event), Pepin, 156 N.H. at 278 (threat made five months before charged event was sufficiently closely connected to charged event as to be admissible), and State v. Allen, 128 N.H. 390, 391, 397 (1986) (threat made in 1980 before the charged event in 1984 was not too remote to be admissible), with State v. McGlew, 139 N.H. 505, 507 (1995) (event occurring six years before charged acts and involving different sex acts with a victim of a different gender than the complainant was not sufficiently connected to the charged acts to be admissible under Rule 404(b)).

8

We turn now to the third prong of the Rule 404(b) analysis, which requires the trial court to consider both the probative value of the relevant evidence and the risk that such evidence will inject unfair prejudice against the defendant into the trial process. Addison (Capital Murder), 165 N.H. at 464. "[E]vidence is unfairly prejudicial if its primary purpose or effect is to appeal to a jury's sympathies, arouse its sense of horror, provoke its instinct to punish, or trigger other mainsprings of human action that may cause a jury to base its decision on something other than the established propositions in the case." State v. Tabaldi, 165 N.H. 306, 322 (2013) (quotation omitted). "Unfair prejudice is not . . . mere detriment to a defendant from the tendency of the evidence to prove guilt, in which sense all evidence offered by the prosecution is meant to be prejudicial." Id. (quotation omitted). "Rather, the prejudice required to predicate reversible error is an undue tendency to induce a decision against the defendant on some improper basis, commonly one that is emotionally charged." Id. (quotation omitted). Among the factors we consider in weighing the evidence are: (1) whether the evidence would have a great emotional impact upon a jury; (2) its potential for appealing to a juror's sense of resentment or outrage; and (3) the extent to which the issue upon which it is offered is established by other evidence, stipulation, or inference. Id. at 322-23.

A trial court can diminish or eliminate the danger of unfair prejudice by issuing a limiting instruction to the jury. See Addison (Capital Murder), 165 N.H. at 464; State v. Towle, 167 N.H. 315, 324 (2015). "The trial court is in the best position to gauge the potential prejudicial impact of particular testimony, and to determine what steps, if any, are necessary to" diminish or eliminate "the potential prejudice." Towle, 167 N.H. at 324. Thus, we afford considerable deference to the trial court's balancing of prejudicial impact and probative worth. Pepin, 156 N.H. at 278.

The record supports the trial court's determination that the probative value of the evidence was not substantially outweighed by its prejudicial effect. See id. at 279. As noted above, the Nottingham incidents are probative of the defendant's intent. See id. Because intent was an issue that was actually in dispute, the probative value was significant. See id. On the other side of the ledger, the prejudicial impact to the defendant of the evidence was limited because "the trial court admitted the evidence for the sole purpose of determining the defendant's intent and so instructed the jury." Id. (quotation omitted). The jury is presumed to follow the trial court's instructions. Id. Given the trial court's limiting instructions to the jury, any prejudice from admitting evidence of the Nottingham incidents was slight. See id. For all of these reasons, therefore, we hold that the trial court did not unsustainably exercise its discretion by admitting them into evidence. See id.

9

The defendant next contends that the trial court erred by admitting evidence of his statements to the victim's aunt and to his son about the victim's body as relevant to his intent or state of mind. Specifically, he argues that the evidence was not relevant to show his intent and that, even if relevant, its probative value is substantially outweighed by the danger of unfair prejudice. Even were we to assume that admission of the statements constituted error, we conclude that any such error was harmless beyond a reasonable doubt.

"An error is harmless only if it is determined, beyond a reasonable doubt, that the verdict was not affected by the error." State v. Palermo, 168 N.H. 387, 398 (2015) (quotation omitted). The State bears the burden of establishing that an error is harmless. Id. "An error may be harmless if the alternative evidence of the defendant's guilt is of an overwhelming nature, quantity or weight, and if the inadmissible evidence is merely cumulative or inconsequential in relation to the strength of the State's evidence of guilt." Id. (quotation omitted). "In determining whether an error was harmless, we consider the alternative evidence presented at trial as well as the character of the inadmissible evidence." Id. (quotation omitted).

Here, the alternative evidence that the defendant committed the charged sexual assaults was of an overwhelming nature. The victim testified at trial "providing specific details about the individual assaults." State v. Wells, 166 N.H. 73, 83 (2014). She gave graphic testimony about the defendant assaulting her "almost weekly" with his penis, his fingers, and objects.

The State did not rely solely upon the victim's testimony, however. See id. Rather, the State also produced witnesses who corroborated portions of her testimony. In addition, the State produced physical evidence from which the jury could have reasonably inferred that the assaults occurred, including the comforter from the victim's bed, which tested positive for the defendant's semen, and a vibrator which tested positive for both the victim's and the defendant's genetic material.

Additionally, the jury heard evidence that, when confronted with the victim's accusation, the defendant fled the home and threatened to commit suicide. The jury could reasonably have inferred from such evidence that the defendant was conscious of his guilt. See State v. Torrence, 134 N.H. 24, 27 (1991) (stating that "[i]t is beyond dispute that evidence of post-offense flight is probative on the issue of the defendant's consciousness of guilt"); State v. Brown, 128 N.H. 606, 616 (1986) (explaining that "[j]ust as a jury may consider flight after a crime as showing consciousness of guilt, it may also consider attempted suicide, as an attempt to flee and escape forever from the temporal consequences of one's misdeed" (quotation and citation omitted)).

The jury also heard a voicemail message that the defendant left for the victim on the evening of January 30, 2016, the day on which she disclosed the abuse to the defendant's wife. In that message, the defendant told the victim, "You understand, right, if you testify, if you press charges against me, I'm going to jail, I just want you to know that, alright, but that's alright, Suzanne will take care of you. . . . Dad will see you whenever. Who knows." Such evidence enabled the jury "to assess the defendant's tone of voice and behavior during the call and to consider the substance of his statements as admissions of guilt." Wells, 166 N.H. at 83.

In relation to the strength of this evidence, testimony about sexualized comments that the defendant made "[a] few times" to the victim's aunt and once to his son about the victim's body, was inconsequential. See id. Because the alternative evidence of the defendant's guilt was overwhelming and the testimony of the victim's aunt and the defendant's son about his comments was inconsequential, we conclude that the admission of the challenged testimony was harmless beyond a reasonable doubt. See id. at 83-84.

Affirmed.

LYNN, C.J., and BASSETT, HANTZ MARCONI, and DONOVAN, JJ., concurred.